ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
BAE Systems San Francisco Ship Repair ) ASBCA No. 58809
)
Under Contract No. W912SU-04-D-0005 )

APPEARANCE FOR THE APPELLANT: Peter B. Jones, Esq.
Jones & Donovan
Newport Beach, CA

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ John R. Longley, JA
CPT Tyler L. Davidson, JA
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE TING
ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

The Army (government) awarded BAE Systems San Francisco Ship Repair (BAE or BAESFSR) a task order under a multiple-award, task order contract (MATOC) for the programmed maintenance of a Logistics Support Vessel. The parties' disputes relate to the proper equitable adjustment of two items under the task order: (1) the replacement of 24 tie-down features on the vessel's main deck known as "cloverleafs"; and (2) the replacement of the vessel's potable and drain piping systems. BAE moves for summary judgment on its cloverleaf claim contending that, as a matter of law, it is entitled to the $285,101 claimed because that amount was verified by a Defense Contract Audit Agency (DCAA) report as having been incurred.[1] The Army opposes the motion. For reasons set out below, we deny the motion.

*Background*

In 2004, the Mission and Installation Contracting Command at Fort Eustis, Virginia, received a requirement to issue contracts for the maintenance and repair of three classes of landing craft stationed at various ports in the Pacific Ocean (R4, tab 137 at 1). The vessels included the Army's Logistics Support Vessels also known as "LSV" - class

---

[1] BAE's motion for summary judgment on the cloverleaf claim was received at the Board on 3 March 2014. Subsequently, BAE filed a second motion for summary judgment on the piping claim received at the Board on 3 April 2014. This decision addresses the first or the cloverleaf motion for summary judgment.

vessels. The effort was referred to as the "Programmed Drydocking, Cleaning, Painting, Repairs and Modifications to US Army Active and Reserve Vessels Located on the West Coast of the United States and Hawaii." The work would be executed as a task order under a MATOC. (*Id.*)

BAE was one of five shipyards on the West Coast that competed for and received the right to bid on task orders issued for the Army's West Coast watercraft. On 2 April 2004, MATOC Contract No. W912SU-04-D-0005 (Contract 0005) was awarded to BAE in the estimated amount of $99,476,431.91. The contract was for a base year and four one-year options. (R4, tab 137 at 2)

Each task order under Contract 0005 would identify definite and indefinite work items to be performed. The contract defined "Definite Item" to mean "[k]nown work that shall be diligently prosecuted upon issuance of delivery order." The contract defined "Indefinite Item" to mean "[w]ork to be accomplished only upon the written approval of the Contracting Officer. Activation of an indefinite item does not entitle the Contractor to an extension of the performance period." (R4, tab 1 at 24, ¶¶ C.0.1.7., C.0.1.12.)

Contract 0005 also addresses situations where the government determines, during the repair of a vessel, that additional replacement parts, materials and installation are required:

> C.0.2.23.1. In addition to work specified in the specifications the Contractor shall furnish additional replacement parts, materials and installation which are determined to be required by the Government. The Contractor shall purchase additional replacements [sic] parts and materials required under this paragraph at the lowest known cost and shall be paid at cost. "At cost" is defined as the actual net cost of such parts and materials to the contractor including any and all discounts, rebates and allowances thereon (regardless of the date of purchase), material handling costs properly allocable to such parts or materials (if such costs are not reimbursable under any other provision of this contract), and properly identified and supported freight or transportation charges. The Contractor shall install and test such replacement parts and materials at no additional cost to the Government.

> C.0.2.23.2. If it is determined by the Government that additional replacements parts and materials require machining or fitting, the Contractor shall be paid under this paragraph at cost, as defined herein. The Contractor shall be compensated for installation of replacement parts or materials requiring

2

machining and fitting. Costs for replacement parts, materials and installation shall be allowed to the extent that they are reasonable, allocable and allowable in view of the principles of FAR Part 31.

(R4, tab 1 at 30)

In addition, Contract 0005 included in full text the DFARS 252.217-7003, CHANGES (DEC 1991); DFARS 252.217-7004, JOB ORDERS AND COMPENSATION (DEC 1991); DFARS 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) clauses (R4, tab 1 at 340-41, 352). The contract incorporated by reference the DFARS 252.243-7001, PRICING OF CONTRACT MODIFICATIONS (DEC 1991) clause providing:

When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract, apply.

(R4, tab 1 at 329) The contract also included in full text the DFARS 252.217-7028, OVER AND ABOVE WORK (DEC 1991) clause, that provides in pertinent part:

(a) *Definitions.*

As used in this clause –

(1) *Over and above work* means work discovered during the course of performing overhaul, maintenance, and repair efforts that is --

(i) Within the general scope of the contract;

(ii) Not covered by the line item(s) for the basic work under the contract; and

(iii) Necessary in order to satisfactorily complete the contract.

. . . .

(e) The Contractor shall promptly submit to the Contracting Officer, a proposal for the over and above work. The Government and Contractor will then negotiate a settlement for the over and above work. Contract

3

modifications will be executed to definitize all over and above work.

(f) Failure to agree on the price of over and above work shall be a dispute within the meaning of the Disputes clause of this contract.

(R4, tab 1 at 350-51)

Contract 0005 included a provision entitled "OFFEROR'S FULLY BURDENED LABOR RATE FOR THE SECOND OPTION PERIOD." This provision states:

a. Changes are inherent to vessel repair contracts and should be expected by the Contractors. Offerors shall include a fully burdened labor rate to be used in negotiating changes. The rate must include all costs for negotiating changes, including but not limited to, G&A, overhead, profit, cost of money, etc. The offeror shall insert rates below that it agrees to use in negotiating changes for new or additional work. These rates shall prevail throughout satisfactory completion of the base period.

(R4, tab 1 at 393) For Option Period Two, from 1 December 2006 through 30 November 2007 (R4, tab 1 at 2), relevant here, this provision set the contractor's fully burdened labor rate at $73.50, G&A rate at 8.82%, and profit rate at 10% (R4, tab 1 at 393).

On 27 December 2006, Delivery Order (or task order) 0002 was awarded to BAE for an estimated amount of $4,889,413.73 for the programmed drydocking, cleaning, painting and repairs to the U.S. Army Vessel LSV-5. The LSV is an ocean-going vessel and is designed to carry supplies and equipment across the ocean or from other ships to shore. The bow ramp can be lowered on a beach to allow for cargo to be off-loaded, and the stern ramp allows cargo to be loaded and off-loaded onto a pier. The LSV-5 is based at Bishop's Point, Hickam Air Force Base, Hawaii. Every three years, Class 1 vessels such as LSV-5, undergo drydocking and maintenance in order to keep all certifications current. Army vessels, unlike Navy warships, are built and maintained to commercial standards and use the American Bureau of Shipping as the certifying party. (R4, tab 137 at 2)

4

Moving for summary judgment, BAESFSR relies upon the following undisputed material facts derived from the parties' pleadings, materials in the Rule 4 file, and the declaration of Rick Brandt, BAE's Finance Manager which are incorporated in the Statement of Facts below.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. BAESFSR operates a ship repair yard in San Francisco, California (compl. and answer ¶ 1).

2. Contract No. W912SU-04-D-0005 is an indefinite-quantity delivery-order contract between BAESFSR and the Department of the Army, acting through the U.S. Army Contracting Center, Fort Eustis, Virginia (the Army) (compl. and answer ¶ 2).

3. Fixed-price Delivery Order No. (D.O.) 0002 was issued by the Army on 27 December 2006 and called for various repairs and other work on the vessel LSV-5 (Contract No. W912SU-04-D-0005 and D.O. 0002 collectively the "LSV-5 contract") (compl. and answer ¶ 3).

4. The LSV-5 contract provided a performance period of 120 calendar days and provided liquidated damages of $4,161.00 for each calendar day of delay; by bilateral Modification No. 01 the contract required completion of all work by 27 July 2007 (compl. and answer ¶ 4; R4, tabs 3, 6).

5. BAESFSR began work on the vessel LSV-5 in March 2007; during prosecution of the work, in June 2007, the Army contracting officer's representative (COR) at BAESFSR's shipyard requested that BAESFSR provide a price to replace certain tie-down fixtures located in the ship's decks, known as "cloverleafs" (compl. and answer ¶ 5).

6. After locating a supplier for the cloverleaf deck inserts, on 22 June 2007 BAESFSR submitted a proposal for replacement of the cloverleafs for a total equitable adjustment of $217,406.88 (compl. and answer ¶ 6; R4, tab 49).

7. The Army COR generated "Specification Worksheet" No. 47 dated 3 July 2007 for "Main Deck Cloverleaf Replacement" which called for the contractor to "furnish materials, parts and equipment to crop out and replace 24 deteriorated cloverleafs on the main deck as designated by the Ship Surveyor"; the Army's Specification Worksheet

---

[2] Appellant refers to itself as BAESFSR in its motion for summary judgment.

offered a total price of $96,157.01 for the cloverleaf replacements (compl. and answer ¶ 7).

8. BAESFSR declined to agree to the price offered by the Army's Specification Worksheet No. 47 and did not sign the Worksheet's Supplemental Agreement (compl. and answer ¶ 8).

9. By unilateral Contract Modification No. 06 dated 19 July 2007, the contracting officer directed the contractor to perform Worksheet No. 47 "Main Deck Cloverleaf Replacement" as one of several changes made pursuant to DFARS 252.217-7028 entitled "Over And Above Work" (the "cloverleafs change order"). Unilateral Modification No. 06 also extended the contract completion date to 23 August 2007. (Compl. and answer ¶ 9; R4, tab 72)

10. BAESFSR performed the cloverleafs change order and its work was accepted by the Army (compl. and answer ¶ 10).

11. BAESFSR maintains a job order accounting system to collect the actual labor hours and costs of performing discrete contracts and discrete tasks within contracts, including changes (decl. of Rick Brandt).

12. BAESFSR created a specific item number within its job order accounting system to collect the labor hours incurred to perform the cloverleafs change order (decl. of Rick Brandt).

13. The item number created by BAESFSR to collect labor hours to perform the cloverleafs change order was used by BAESFSR production labor supervisors to identify on daily time sheets the hours expended by workers performing the change. The time sheet information was put into BAESFSR's computerized accounting system which then produced job labor distribution reports which listed and summarized all labor expended in performing the cloverleafs change order. (Decl. of Rick Brandt)

14. The item number created by BAESFSR for the cloverleafs change recorded a grand total of 4102.5 labor hours in performing the cloverleafs change order, of which 1407.5 were overtime hours (decl. of Rick Brandt; R4, tab 112 at 4).

15. After completion of the LSV-5 contract, by letter dated 3 June 2010, BAESFSR submitted to the contracting officer several revised requests for equitable adjustment (REAs) including REA No. 6, for the cloverleafs change. Revised REA No. 6 was based on BAESFSR's actual labor hours expended in performing the cloverleafs change as reported in BAESFSR's Job Labor Status Report, together with BAESFSR's actual costs of materials and subcontractor work required to perform the change order as reported in BAESFSR's Material Status Report. (R4, tabs 111, 112 at 2-8)

6

16. The LSV-5 contract provided a "fully burdened labor rate to be used in negotiating changes"; the fully burdened labor rate was "$73.50 per hour"; the contract also provided rates of 8.82% G&A and 10% profit for markup of subcontract labor costs and material costs for use in negotiating changes for new or additional work (compl. and answer ¶ 16; R4, tab 3 at 10).

17. BAESFSR calculated REA No. 6 by applying the "fully burdened labor rate" of $73.50 to the labor hours recorded for the cloverleafs change order and by applying 50% of that rate to the recorded overtime hours (R4, tab 112 at 3, tab 129, DCAA Audit Report at 4 n.3).

18. BAESFSR converted its REA No. 6 into a certified claim by letter dated 11 July 2011 (the "cloverleafs claim"). The total amount of that claim was the total amount requested by revised REA No. 6, increased by the amount of the cost of the cloverleafs themselves, a revised total claim amount of $381,258, less the amount allowed by unilateral Modification No. 06 for the cloverleafs change, $96,157, a net claim total amount of $285,101. (*See* decl. of Rick Brandt ¶ 5) The elements of BAE's certified claim are set out in the table below:

| Labor: | |
|---|---|
| 4,102.5 regular hours @ $73.50 | $301,534 |
| 1,407.5 overtime hours @ $36.75 | $ 51,726 |
| **Materials:** | |
| 24 Cloverleafs | $ 3,480 |
| Other Materials | $ 12,710 |
| Subcontractor Materials | $ 7,200 |
| **G&A at 8.82%** | $ 2,063 |
| **Profit on Materials & Subcontractors** | $ 2,545 |
| Total Equitable Adjustment Requested | $381,258 |
| Less Allowed by Unilateral Modification No. 6 | ($ 96,157) |
| Equitable Adjustment Claimed | $285,101 |

(R4, tab 121)

19. BAESFSR's claim for the cloverleafs change included material costs of $16,190 and subcontractor costs of $7,200 based on cost records; the claim included markups of those costs for G&A and profit at the contract rates of 8.82% and 10% (R4, tab 121).

20. On 28 October 2011 the Army contracting officer requested the DCAA to audit BAESFSR's cloverleafs claim (compl. and answer ¶ 20).

7

21. DCAA conducted an audit during the period February through August 2012. During the audit, DCAA requested and was provided with various BAESFSR original cost records, including time sheets. (Decl. of Rick Brandt)

22. By Audit Report No. 4281-2012W17200001 dated 31 August 2012, DCAA reported the results of its audit (compl. and answer ¶ 22).

23. DCAA's Audit Report questioned none of the costs or the net amount of $285,101 proposed by BAESFSR in support of its claim on the cloverleafs change, and DCAA reported, in part:

> We examined BAE Systems SFSR's equitable adjustment claims to determine if the proposed costs are acceptable for settlement.
>
> ....
>
> We evaluated the claim costs using the applicable requirements contained in the:
>
> - Federal Acquisition Regulation (FAR); and
> - Defense FAR Supplement (DFARS).
>
> ....
>
> In our opinion, BAE Systems SFSR has submitted adequate data to support its claim.
>
> ....
>
> 2. BAE Systems SFSR's Proposed Costs:
>
> BAE Systems SFSR established...charge numbers[;] one for REA No. 6...to take costs. BAE Systems SFSR prepared its proposed REAs costs using the recorded costs from these...charge numbers....
>
> 3. Labor
>
> a. Summary of Conclusions:

8

We take no exception to the proposed labor cost, labor hours and labor rate for both REA No. 6 and No. 7.

....

...We reconciled the proposed labor charges from the claim to the labor distribution report for each REA. Employee labor charges were selectively traced to the labor distribution report for each REA.

(R4, tab 129 at 3-7 of 16)

24. BAESFSR's cloverleafs claim included material costs of $16,190 and subcontractor costs of $7,200; concerning those costs, DCAA reported:

4. Material

....

We take no exception to the proposed REA No. 6...material costs proposed by BAE Systems SFSR[.]

....

We reconciled REA No. 6 proposed $16,190 material amount to BAE Systems SFSR purchase orders, or vendor delivery records and/or records of vendor payments made by BAE Systems SFSR.

....

5. Subcontracts

....

REA No. 6

We take no exception to the proposed subcontract costs of $7,200.

....

6. General and Administrative Rate

....

> We take no exception to the proposed G&A burden
> applied to materials and subcontracts for REA No. 6.

> ....

> 7. Profit

> ....

> We determined that the negotiated profit rate of 10
> percent was correctly applied to material and subcontract costs.

(R4, tab 129 at 7-10 of 16)

25. By letter to BAESFSR dated 28 May 2013, the Army contracting officer dismissed the DCAA Audit Report stating:

> The audit report was not thorough and did not provide any
> clarification.

> ....

> All DCAA did, unfortunately was to verify the addition of the
> claim without verifying any of the underlying facts.

(R4, tab 131)

26. By letter dated 25 July 2013 the contracting officer issued a final decision on BAESFSR's cloverleafs claim (R4, tab 137). The contracting officer did not use the DCAA Audit Report but dismissed that Report entirely (*id.* at 6).

*The Government's Opposition*

As is its practice, the Army's answer to BAE's complaint included Part II. Paragraphs 14 through 48 of Part II pertain to the cloverleaf replacement dispute.[3] To the

---

[3] By letter dated 6 March 2014, the Board directed BAE to file an answer to Part II of the government's answer to its complaint. BAE filed its answer on 3 April 2014. It denied the allegations in ¶¶ 21, 22, 24, 26, 27, 28, 29, 30, 31, 32, mainly on the basis that the COR's log (R4, tab 92) from which the government's allegations

extent relevant and material, we summarize below the Army's version of the facts from documents in the Rule 4 file and its opposition to BAE's motion for summary judgment (gov't reply).

27. The Army's estimate to replacement the cloverleafs was set out in Specification Worksheet No. 47 of 3 July 2007. The Army believed replacing 24 cloverleafs should cost $96,157.01. It allowed 1,200 labor hours at $73.50 or $88,200 in labor cost; it accepted $7,312 in material costs BAE proposed; and it added 8.82% or $544.00 for G&A and allowed no profit. (R4, tab 72)

28. Even though BAE knew it had to cut out the cloverleafs and weld the new ones in place, it began painting the main deck in areas where the cloverleafs would be installed. On 20 July 2007, the CO issued a deficiency report instructing BAE "not to paint the remaining cloverleafs due to their deteriorated condition." (R4, tab 75; answer, part II at 33, ¶ 21) As of 23 July 2007, BAE had not begun the cloverleaf work (R4, tabs 92, 93; answer, part II at 33, ¶ 22). The cloverleaf sockets arrived at the site on 24 July 2007 (R4, tab 80 at 1, answer, part II at 33, ¶ 23).

29. On 25 July 2007, BAE marked the cloverleafs to be replaced (answer, part II at 33, ¶ 24). The COR noted in his daily log "very few actual shipyard workers on board this afternoon" (R4, tab 92 at 65). The daily log of 26 July 2007 indicated that BAE was "[s]taging equipment…brought on board for the cloverleafs. Yard is marking the pattern of the cloverleafs on the main deck so they can be installed in the correct position." (*Id.*) The daily log of 27 July 2007 indicated: "Yard has cut the deck portion of 3 cloverleafs. Talking to the worker doing the cutting, stated that it takes approx 5 minutes to completely cut the deck for one cloverleaf." (*Id.* at 66; answer, part II at 34, ¶ 26)

30. The daily log for 30 July 2007 indicated that "18 of the 24 cloverleafs have been cropped out and reinstalled by welding. 4 deck sockets have been cropped out and also welded in place over the weekend." (R4, tab 92 at 67; answer, part II at 34, ¶ 27) The daily log for 6 August 2007 indicated that all cloverleafs had been installed and welded but pull test and vacuum box test still needed to be completed (R4, tab 92 at 70; answer, part II at 34, ¶ 28). The daily log for 7 August 2007 indicated that the COR inspected the remaining cloverleafs for surface preparation and gave BAE permission to paint (R4, tab 92 at 71; answer, part II at 34, ¶ 29). The daily log for 8 August 2007 indicated the COR witnessed pull test on the cloverleafs and "[n]o signs of welds cracking seen" (R4, tab 92 at 72; answer, part II at 34, ¶ 30).

---

were derived has not been authenticated. In opposing BAE's motion for summary judgment, the government provided a declaration from Denny D. Large, Jr., the COR, stating that the "COR log…is maintained on a daily basis by the COR" (gov't reply, decl. of Denny D. Large, Jr.).

31. The daily log for 9 August 2007 indicated that the COR inspected undersides of four cloverleafs and found the "[p]aint looks good and only a few cloverleafs...need a final coat," and found no problems in testing the vacuum box on remaining cloverleafs (R4, tab 92 at 73; answer, part II at 34, ¶ 31). The 17 August 2007 weekly progress report indicated that the cloverleafs (Item No. 2033-2) were "100% complete as of 15 August 2007" (R4, tab 89 at 11; answer, part II at 35, ¶ 32).

32. Russ Giacalone was BAE's foreman on the LSV-5 repair. The job order accounting system BAE provided to the DCAA auditor showed nearly all of Mr. Giacalone's time from 27 July 2007 forward was dedicated to the cloverleaf replacement work (gov't reply at 4; R4, tab 139.56 at 26-27, 28-29). In opposing BAE's motion for summary judgment, the government provided Mr. Giacalone's 29 March 2012 reply to DCAA, as well as the COR's affidavit, showing the hours claimed for Mr. Giacalone included work unrelated to the cloverleaf replacement and to work BAE was already obligated to do under its contract (gov't reply at 4-5; R4, tab 139.48 at 2, decl. of Denny D. Large Jr.).

33. The Weekly Progress report in the record shows the cloverleaf work was 100% complete as of 15 August 2007 (R4, tab 89 at 11). The government points out that of the 4,102.5 labor hours claimed for the cloverleaf replacement work, over a quarter or 1,203.5 hours is for work that took place after 15 August 2007 (gov't reply at 5; R4, tab 139.56 at 17-43). The COR's log shows all of the cloverleafs were installed and welded in place by 6 August 2007 (R4, tab 92 at 70). In opposing BAE's motion for summary judgment, the government contends there was no need for shipfitters, sheetmetal, and carpenter labor from 7 to 15 August 2007. Referring to BAE's spreadsheet from its job order accounting system, the government contends that BAE claims shipfitter, sheetmetal and carpenter hours from 7 to 15 August 2007. (Gov't reply at 6; R4, tab 139.56 at 17-43)

34. In opposing BAE's motion for summary judgment, the government contends that BAE's claim fails to distinguish between work already required under its contract and the work required as a result of the cloverleaf replacement. The government asserts that the 618.50 labor hours claimed for painting the cloverleafs were for work already required by paragraph C.33.9.5 of Contract 0005. (Gov't reply at 6-7; R4, tab 1 at 109, tab 139.56 at 34-37, 37-39)

35. BAE claims 1,408 overtime hours at $110.25 per hour (R4, tab 112 at 3). In opposing BAE's motion for summary judgment, the government contends "[t]he Contract never authorized overtime, nor does the appellant allege it received authorization for overtime work" (gov't reply at 16).

36. By email to the CO on 8 October 2007, BAE sought $339,536.15 for the cloverleaf replacement work (R4, tab 96 at 2; answer, part II at 35, ¶ 35). The CO's 29 November 2007 response asked for additional information on BAE's revised price and an explanation on why the claimed amount varied from the original estimate (R4, tab 98 at 1; answer, part II at 35, ¶ 36). In response, BAE provided a Change Order Route Slip with the following breakdown:

| Labor | |
|---|---|
| 4,392 straight hours at $73,50 | $322,812.00 |
| 1,404 overtime hours at $36.75 | $ 51,597.00 |
| **Materials:** | |
| Materials | $   9,150.00 |
| Rents | $ 1,078.[32] |
| **Subcontractors** | $   7,200.00 |
| **G&A** @ 8.82% | $   1,537.18 |
| **Profit** @ 10% | $     720.00 |
| **Total** | $394,094.50 |

(R4, tab 99 at 4; answer, part II at 35, ¶ 37) The CO's 19 December 2007 email told BAE that it had not provided sufficient substantiating documentation in support of its claim (R4, tab 100; answer, part II at 36, ¶ 38).

37. BAE submitted REA No. 6 by an undated letter. The REA sought $394,094.50 "for the additional work performed to procure and install 24 Cloverleaf Tie Down Sockets" (R4, tab 104 at 2). The REA included a number of previously submitted documents, and (1) a 20 June 2007 quotation from Peck & Hale for 20 F518-1E Aircraft Socket made in Korea at $145.00 per unit for a total of $2,900 ($145 x 20) (*id.* at 4); (2) a 11 July 2007 quotation from Delta Sandblasting Company, Inc. (Delta) for "[s]taging for twenty five different locations in the voids and ballast tanks…[at] $2,600 per location" (*id.* at 6); and (3) a 11 July 2007 quotation from Delta for "[t]ouch up for the twenty five different locations in the voids and ballast tanks…[at] $2,500 per location" (*id.* at 7).

38. The CO's 30 March 2010 letter asked for workload documentation and material receipts for the additional $10,228.32 in materials claimed, evidence of $7,200 paid to subcontractors, time cards, and substantiation that BAE spent a total of over 7,000 hours on 24 cloverleafs. The letter stated that "[b]ased on similar work at other contractor facilities, I have determined that BAE was generously compensated and no additional money is due." (R4, tab 109 at 4)

13

39.  BAE's undated response reduced its REA No. 6 labor hours to 4,103 and overtime hours to 1,408.  It revised its material costs to $12,710 and claimed $7,200 for subcontractor sandblasting, calculating a net amount owed to be $279,544:

| Labor: | |
| --- | --- |
| --4,103 hours @ $73.50 | $301,571 |
| --1,408 OT hours @ $36.75 | $ 51,744 |
| **Material** | $ 12,710 |
| **Subcontractor (sandblasting)** | $ 7,200 |
| **G&A** @ 8.82% (materials and subcontractor) | $ 1,756 |
| Total | $375,701 |
| Less unilateral Modification No. 06 | ($ 96,157) |
| Claim | $279,544 |

(R4, tab 112 at 3)

40.  Addressing the CO's comments, BAE explained that:  (1) the COR's observation did not "capture the entire work effort required to perform…all of the necessary work" because "shipyards perform work both in the shop and on board the ship"; (2) "observations of actual deck plate work [did] not take into consideration shop related work, mobilization, setup, tear down, equipment preparation or tool check out time" and these events occurred at different times, different shifts or at the same time; (3) the COR's observation took place "during the removal stage which is the simplest part of the work.  A majority of the work require[d] hours of grinding and weld preparation with welding that occur[red] on the deck as well as in the overhead of the affected space.  All hot work also require[d] fire watch services in the space below"; and (4) "what may be an acceptable charging practice and pricing action in one shipyard under another contract it may or may not be so in another shipyard under a different contract."  (R4, tab 112 at 2)

41.  BAE submitted its certified claim to the CO by letter dated 11 July 2011 seeking $285,101:

14

| | |
|---|---|
| 4,102.50 hours @ $73.50 | $301,534 |
| 1,407.50 hours of OT @ Differential $36.75 | $ 51,726 |
| Material: | |
| 24 Cloverleafs (Invoice Attached) | $ 3,480 |
| Other (Material Status Report Attached) | $ 12,710 |
| Subs (Material Status Report Attached) | $ 7,200 |
| G&A @ 8.82% of Material and Subs | $ 2,063 |
| Profit on Material, Subs @ 10% | $ 2,545 |
| Total Equitable Adjustment Due | $381,258 |
| Less Allowed by Unilateral Mod 06 | ($96,157) |
| Additional Equitable Adjustment | $285,101 |

(R4, tab 121; answer, part II at 38, ¶ 45)

42. The CO requested an audit from the DCAA. The DCAA issued its report (Audit Report No. 4281-2012W17200001) on 31 August 2012 (R4, tab 129). The audit stated that DCAA evaluated the claimed costs following the applicable requirements contained in the Federal Acquisition Regulation (FAR) and the Defense FAR Supplement (DFARS) (*id.* at 3 of 16). It opined that BAE "has submitted adequate data to support its claim," and "consider[ed] the claim to be acceptable as a basis for negotiation of fair and reasonable settlements" (*id.* at 4 of 16).

43. On a more detailed level, the DCAA took no exception to the proposed labor cost, labor hours and labor rate for REA No. 6 (R4, tab 129 at 6 of 16). It found BAE's "Proposed labor hours are based on those recorded on individual employee's timesheets and accumulated in labor distribution reports for each REA (*id.*) and it was able to reconcile "the proposed labor hours from the claim to the labor distribution report for [the] REA," and "[e]mployee labor charges were selectively traced to the labor distribution report for each REA" (*id.* at 6-7 of 16). It took no exception to the material costs proposed by BAE. It was able to reconcile the proposed $16,190 material amount to BAE's purchase orders, or vendor delivery records and/or records of vendor payments made by BAE (*id.*). It took no exception to the proposed subcontractor costs of $7,200 finding that BAE "provided a vendor invoice and record of payment to support its proposed subcontract costs for sand blasting twenty-four clover leaf deck sockets" (*id.* at 7 of 16). It took no exception to the proposed G&A burden applied to materials and subcontracts. It applied the 8.82% G&A rate to the materials and subcontract costs and found "[t]he computed amounts reconciled to the proposed amounts" (*id.* at 9 of 16). BAE's proposed profit of $2,545 was based on a rate of 10 % applied to material and subcontract costs. The DCAA determined that BAE's profit of $2,545 at the profit rate of 10% was correctly applied to material and subcontract costs (*id.* at 10 of 16).

15

44. Even though the DCAA took no exception to each element of BAE's claim, it cautioned that "the primary purpose of our examination is to review the quantum aspects of the claim," and "[t]his assumes [BAE] can demonstrate legal entitlement" (R4, tab 129 at 3 of 16).

45. The CO denied BAE's claim by decision issued on 25 July 2013. On the DCAA's audit, the CO stated that the DCAA did not verify "that the costs claimed related to the work performed on the cloverleaf repairs," and that the "DCAA had no knowledge of the actual facts and did not look beyond the information offered by BAE" (R4, tab 137 at 6). On whether unilateral Modification No. 06 fairly compensated BAE, the CO observed that BAE was paid approximately $4,000 per cloverleaf. She stated that on LSV-6, the Army paid $660 per cloverleaf in Kuwait and when the vessel returned to the United States, the Army paid $1,637.60 per cloverleaf. She pointed out that on LSVs 2, 3, 4 and 5, the Army paid as low as $1,575.00 and as high as $1,986.00. The decision stated "You have already been paid a minimum of twice the amount of any price obtained from other shipyards....Your current claim would be ten times that of some of the shipyards as you are seeking almost $16,000 per cloverleaf." (*Id.* at 7)

46. On overtime hours, the CO took the position that "[t]he fully burdened labor rate includes your average amount of overhead, and you are not compensated additionally for overtime" (R4, tab 137 at 7). The CO also did not find the 4,102.50 labor hours claimed to have been spent on the cloverleaf replacement credible because BAE claimed to have spent 512 work days out of approximately 582 work days recorded in the contemporaneous progress reports during the 18 days between 24 July and 10 August 2007 when the cloverleaf work was performed. According to the CO, the period was in the "getting-to-the-end-of-performance-working-on-everything phase of the contract," when work was being done on "the potable water tanks, the sewage tanks, the starboard fuel tank, starboard scuttle, testing of bulkhead penetrations, the exhaust stack door, reworking the piping for the hot water heater and recirculating pump that was piped incorrectly, pilot house windows, and the stern ramp" (*id.*).

## DECISION

During the programmed drydocking, cleaning, painting and repairs of the U.S. Army vessel LSV-5, the COR determined that 24 cloverleafs on the main deck of the vessel needed to be replaced. BAE submitted an estimate of $217,406.88 to do the work. The Army performed its own estimate, considered the amount estimated by BAE excessive and issued unilateral Modification No. 06, pricing the work at $96,157.01. BAE performed the work and submitted REA No. 6 for $394,094.50. This amount did not account for the $96,157.01 allowed which would have reduced the net amount claimed to $297,937.49. Unable to resolve their differences, BAE submitted a certified claim in the amount of $258,101. DCAA audited BAE's claim and issued a report in August 2012 taking no exceptions to the various costs elements claimed. The DCAA

16

report cautioned, however, that the purpose of the audit was to review the quantum aspects of the claim, assuming that BAE had demonstrated entitlement.

Moving for summary judgment, BAE tells us that this case presents a single issue: "should the contractor's equitable adjustment amount be based on the contractor's actual, recorded costs of performing the change, as confirmed by Government auditors, or should the amount be based on an estimate by Government personnel?" BAE states "The law is clear: actual incurred costs, confirmed by DCAA, must be the measure of the equitable adjustment." (App. mot. at 6) BAE contends that Contract 0005's PRICING OF CONTRACT MODIFICATIONS (DEC 1991) clause at DFARS 252.243-7001 requires price adjustment under the contract be based on "the contract cost principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract," and since "DCAA's Audit Report confirms, BAESFSR's proposed costs are actual costs recorded in a charge number established 'to take costs' of REA No. 6...those costs 'should be used to determine the equitable adjustment'" (app. mot. at 7) (citation omitted).

Summary judgment is appropriate when the cited materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other material show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(a), (c)(1); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party has the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes the requisite showing, then the burden shifts to the nonmoving party to show there is a genuine factual issue for trial. *Id.* In deciding motions for summary judgment, we do not resolve factual disputes, but determine if genuine disputes of material facts exist. *Applied Companies*, ASBCA Nos. 50593, 52102, 99-2 BCA ¶ 30,554 at 150,883. Moreover, the evidence of the nonmoving party is to be believed, and all reasonable factual inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The substantive law identifies which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248; *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,512 ("Substantive law dictates the parties' relative burdens, and defines those 'material' facts that may affect the outcome of a particular cause of action.").

We do not agree that, as a matter of substantive law, actual incurred costs, confirmed by DCAA, must be the measure of equitable adjustment absent proof from the contractor of reasonableness of the costs claimed. As BAE recognizes, under Contract 0005's PRICING OF CONTRACT MODIFICATIONS clause, when costs are a factor in any

17

price adjustment, the contract cost principles in FAR Part 31 and DFARS apply. What the work actually costs, however, is not the only factor in determining allowability of equitable adjustment. FAR 31.201-2, Determining allowability, provides, in pertinent part:

> (a) The factors to be considered in determining whether a cost is allowable include the following:
>
> (1) Reasonableness.
>
> (2) Allocability.
>
> (3) Standards promulgated by the CAS Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances.
>
> (4) Terms of the contract.
>
> (5) Any limitations set forth in this subpart.

FAR 31.201-3, Determining reasonableness, provides, in part:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business....No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.
>
> (b) What is reasonable depends upon a variety of considerations and circumstances, including –
>
> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
>
> ....

18

(4) Any significant deviations from the contractor's established practices.

Interpreting FAR 31.201-3(a), the Federal Circuit recently affirmed that the contractor has the burden of proof, unaided by a presumption of reasonableness, to establish that the costs it incurred were reasonable. *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1363 (Fed. Cir. 2013) ("It seems that KBR seeks a presumption that it is entitled to reimbursement simply because it incurred facilities costs. It is not."). This Board has long so held. *See Northrop Worldwide Aircraft Services, Inc.*, ASBCA Nos. 45216, 45877, 98-1 BCA ¶ 29,654 at 146,934 (citing *Northrop Worldwide Aircraft Services, Inc.*, ASBCA No. 47442, 97-1 BCA ¶ 28,885).

"Cost reasonableness is a question of fact." *Kellogg Brown & Root Services, Inc. v. United States*, 742 F.3d 967, 970 (Fed. Cir. 2014) (finding the fact a change order tripled the price of providing dining services for roughly double the troops should have prompted the prime contractor to balk or at least request an explanation of how the subcontractor arrived at its proposal). As the Federal Circuit observed, issues relating to reasonableness are "intensely factual," and summary judgment is inappropriate when "the evidence is such that a reasonable jury could reach a verdict in [the non-movant's] favor." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1369 (Fed. Cir. 2003).

Other than demonstrating that it incurred an additional $258,101 to the $96,157.01 the Army paid and that the incurred amount was verified by DCAA, BAE, as the moving party, has failed to make the showing, required by the substantive law of equitable adjustment, that the additional costs incurred met the factors of allowability under FAR 31.201-2, particularly the "reasonableness" factor. *DynCorp*, ASBCA No. 53098, 01-2 BCA ¶ 31,476 at 155,405 (summary judgment denied where "We have been given no opinion by anyone other than a DynCorp employee and no comparative data as to the reasonableness of the specific costs").

Here, even though verified by DCAA to have been incurred, the CO took exception to the costs claimed for the cloverleaf replacement work as unreasonable. The CO cited as examples that the Army paid $1,637.60 per cloverleaf in the case of LSV-6, and paid as low as $1,575.00 and as high as $1,986.00 per cloverleaf on vessels LSV-2, 3, 4 and 5. The CO pointed out that BAE had already been paid approximately $4,000 per cloverleaf under unilateral Modification No. 06, and it would be paid almost $16,000 per cloverleaf, about 10 times the amount charged by contractors in the past, if she were to pay the claimed amount. (SOF ¶ 45)

Based on the COR's contemporaneous progress report logging 582 work days during the 18-day period between 24 July and 10 August 2007, the CO did not find the 512 man-days BAE claimed for the cloverleaf work credible. According to the CO, the cloverleaf

19

work was done during the "getting-to-the-end-of-performance-working-on-everything" phase of the project when numerous other work items were being performed. (SOF ¶ 46)

In opposing BAE's motion for summary judgment, the government has shown that there are disputes of material fact on whether the labor hours claimed were related to the cloverleaf replacement work and whether they were for work already called for by the terms of the contract, and therefore are not ordinary and necessary (SOF ¶¶ 32, 33, 34). These issues ultimately affect the reasonableness of BAE's overall claim for additional compensation.

BAE may or may not be able to prove its entitlement to an additional $258,101. As a matter of law, the reasonableness of its costs is its burden to prove. That burden is not shifted to the government, as the nonmoving party, to show there are genuine factual issues for trial until BAE has met its burden. As the case now stands, there are material facts in dispute relating to the reasonableness of the amount claimed for the cloverleaf replacement work.

In its reply to the government's opposition, BAE contends that "[t]he Government Cannot Disavow or Dispute DCAA's Conclusion Because, Within DoD, DCAA Has Sole Authority to Audit and To Express Those Conclusions" (app. reply at 11). BAE argues that since the DCAA is the exclusive audit agent for DoD, the Army CO was "not competent to substitute her own opinion on BAESFSR's costs for DCAA's" (*id.* at 12), and the Army trial attorneys have no authority to "substitute their arguments and opinions for DCAA's Audit Report" (*id.* at 13).

BAE cites no support for the legal proposition it advanced. The Contract Disputes Act under which it brought its appeal assigned the task of deciding contractor claims to the CO, not the DCAA. 41 U.S.C. § 7103(d), (e) and (f). The DCAA audit report is advisory only. In deciding BAE's claim, it is within the CO's prerogative to accept or reject DCAA's advice.

20

## CONCLUSION

Because BAE has failed to meet its burden demonstrating that its claimed costs, though verified by DCAA as having been incurred, are reasonable under FAR 31.201-2 and 31.201-3, its motion for summary judgment is denied.

Dated:  19 June 2014

PETER D. TING
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58809, Appeal of BAE Systems San Francisco Ship Repair, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

21